THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7                          UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
8                                     AT SEATTLE

9  PUYALLUP TRIBE OF INDIANS,                      CASE NO. C20-1864-JCC

10                          Plaintiff,             ORDER

11         v.

12  ELECTRON HYDRO, LLC, *et al.*,

13                          Defendants.

14

15         This matter comes before the Court on the Puyallup Tribe of Indians' ("Puyallup Tribe")

16  motion for partial summary judgment (Dkt. No. 47).[1] The Court heard oral argument on

17  February 6, 2024 and visited the site on February 15, 2024. Having thoroughly considered the

18  briefing and the relevant record, the Court hereby GRANTS the motion, in part, and DENIES the

19  motion, in part, for the reasons explained herein.

20  **I.    BACKGROUND**

21         This is one of multiple cases before the Court involving a hydroelectric dam on the

22  Puyallup River. *See United States* v. *Electron Hydro, LLC.*, Case No. C20-1746-JCC (W.D.

23  Wash.); *Am. Whitewater* v. *Electron Hydro, LLC*, Case No. C16-0047-JCC (W.D. Wash.). In one

24  of the earlier-filed cases, the Court preliminary enjoined Defendants, the dam's owner(s) and

25  ────────────────────────

26         [1] The Court will address Defendants' cross-motion for partial dismissal, incorporated
    within their response brief, (*see* Dkt. No. 52 at 24–29), by separate order.

ORDER
C20-1864-JCC
PAGE - 1

operator(s), from diverting water into power turbine(s) until they acquire an incidental take permit to support the activity, as required by the Endangered Species Act ("ESA"). *See Am. Whitewater v. Electron Hydro, LLC*, 2021 WL 2530384, slip op. at 5 (W.D. Wash. 2021). The Court then dismissed the case once Defendants agreed to obtain the permit before again producing power. *See Am. Whitewater*, Case No. C16-0047-JCC, Dkt. No. 68. For various reasons, Defendants have yet to obtain this permit. (*See generally* Dkt. Nos. 47, 52.)

The instant case involves Defendants' 2020 effort to replace a portion of a spillway[2] located at the same facility's headworks. (*See generally* Dkt. No. 43.) Prior to 2020, the headworks was comprised of a spillway, with a fish ladder on the right bank and a power intake on the left bank (looking downstream). (*See* Dkt. No. 48 at 605.) Historically, Chinook salmon, steelhead trout, and bull trout, all of which are considered threatened under the ESA,[3] were present in and around the headworks and used the fish ladder for upstream passage. (*See, e.g.*, Dkt. No. 52 at 9). Defendants intended to complete replacement during the 2020 in-water construction season. *See U.S. v. Electron Hydro, LLC*, 2023 WL 5634998, slip op. at 1 (W.D. Wash. 2023).[4] But it did not go as planned.

---

[2] A spillway calms the river above it. Here, the Court supposes it assists in drawing water for power generation purposes. But the historic fixed wood spillway at the headworks periodically collected rock and sediment above it. (*See* Dkt. No. 56 at 2.) Some of this material, inevitably, made its way to the power intake. (*Id.* at 3.) Defendants believed they could resolve the issue by replacing a portion of it with an inflatable bladder spillway. (*Id.*) An inflatable spillway, unlike a fixed one, could be easily manipulated to allow rock, sediment, and other material to pass over and continue downstream, rather than collect above the spillway. (*Id.*)

[3] *See Endangered and Threatened Species: Final Listing Determination for Puget Sound Steelhead*, 72 Fed. Reg. 26,722 (May 11, 2007); *Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for Bull Trout in the Coterminous United States*, 64 Fed. Reg. 58,910 (Nov. 1, 1999); *Endangered and Threatened Species; Threatened Status for Three Chinook Salmon Evolutionarily Significant Units (ESUs) in Washington and Oregon, and Endangered Status for One Chinook Salmon ESU in Washington*, 64 Fed. Reg. 14,308 (March 24, 1999).

[4] While the Court is taking judicial notice of certain facts established in this related case, it does so for context only—they are not intended to be adjudicative. *See* Fed. R. Evid. 201.

In preparation, Defendants lined a temporary bypass channel with field turf and other material. *Id.* It ruptured shortly after they directed the river's flow into the channel. *Id.* Nevertheless, Defendants did not immediately notify the authorities; instead, they continued to remove a portion of the existing spillway, in preparation for its replacement. *Id.* Only once the removal was complete did they notify the authorities, who directed Defendants to stop the spillway replacement and focus on cleaning up the ruptured liner. *Id.* This took some time, as portions had proceeded downstream. *Id.* at 2.

Once Defendants ascertained the cleanup complete, they again sought to install the inflatable spillway. *Id.* But they could not secure the needed authorization(s) before the end of the summer 2020 work window. *Id.* So they pivoted to securing the site for winter.[5] *Id.* In light of the gap where a spillway once stood, Defendants elected to erect a temporary rock dam/spillway[6] in its place. *Id.* They hoped to remove and replace it with the inflatable spillway in 2021. *Id.* But this has not happened. The rock structure remains today, with only minor modification since, and no date certain for its removal. (*See generally* Dkt. Nos. 47, 52.) Its ESA import is presently before the Court.

In a Second Amended Complaint, the Puyallup Tribe contends the rock dam/spillway, in its present form, unlawfully harms and harasses threatened Chinook salmon, steelhead trout and bull trout because it impedes their upstream progress (and therefore their ability to spawn). (*See generally* Dkt. No. 43.) At the same time, it directs these fish away from a nearby ladder, which would allow for passage. (*Id.*) Given Defendants' failure to obtain an incidental take permit, the Tribe seeks summary judgment that the structure represents an unpermitted take of those species

---

[5] They were particularly concerned about protecting the left bank, which contained the power intake, as a portion rests on timber cribbing, rather than a solid foundation. (*See, e.g.*, Dkt. No. 68 at 2.)

[6] The Tribe describes the structure as a "dam" while Defendants describe it as a "spillway." (*Compare* Dkt. No. 43 at 12, 14–16, *with* Dkt. No. 52 at 8, 10–18.) The Court refers to it throughout as a "rock dam/spillway."

1    and must be removed as soon as possible—at a minimum this summer. (*See generally* Dkt. No.

2    47.) Defendants counter the rock dam/spillway does not, in fact, take these threatened species (or

3    at least that the Tribe fails to provide unrebutted evidence that it does). (*See generally* Dkt. No.

4    52.) For this reason, they contend genuine issues of fact preclude summary judgment.

5    **II.    DISCUSSION**

6        **A.    Summary Judgment – Legal Standard**

7        "The court shall grant summary judgment if the movant shows that there is no genuine

8    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

9    Civ. P. 56(a).[7] "The moving party bears the initial burden of establishing the absence of a

10   genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a moving

11   party fails to carry its initial burden of production, the nonmoving party has no obligation to

12   produce anything, even if the nonmoving party would have the ultimate burden of persuasion at

13   trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But

14   once the moving party properly makes and supports their motion, the nonmoving party "must

15   come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

16   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).[8]

17

18

19

---

20       [7] Material facts are those that may affect the outcome of the case, and a dispute about a
     material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for
21   the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In
     deciding whether there is a genuine dispute of material fact, the court must view the facts and
22   justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party.
     *Id.* at 255. The court is therefore prohibited from weighing the evidence or resolving disputed
23   issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

24       [8] Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts"
     will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately,
25   summary judgment is appropriate against a party who "fails to make a showing sufficient to
     establish the existence of an element essential to that party's case, and on which that party will
26   bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

ORDER
C20-1864-JCC
PAGE - 4

1

**B.     The Present Rock Dam/Spillway Is an Unpermitted Take**

2

1.   ESA Framework

3
4
5
6
7
8
9
10
11

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]" 16 U.S.C. § 1531(b). Accordingly, Section 9 prohibits, amongst other things, the "take" of endangered and certain threatened species. 16 U.S.C. §1538(a)(1)(B). This includes Chinook salmon, steelhead trout, and bull trout. *See* 50 C.F.R. §§ 17.31, 223.203 (extending the protections against take to these and other species). Section 10 gives a governing agency discretion to issue an incidental take permit allowing private parties to take a species, but only so long as the "taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

12
13
14
15
16
17
18
19
20
21
22
23
24

A "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. §§ 1532(19), 1538(a)(1)(B). To "harm," in turn, includes "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102. The National Marine Fisheries Service ("NMFS")[9] has indicated that "any habitat modification that significantly impairs spawning, rearing, or migrating" is a harm. 64 Fed. Reg. 60,727 (Nov. 8, 1999). Whereas to "harass" includes "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3 NMFS has indicated this may include a structure altering streamflow. *See* 64 Fed. Reg. at 60,728 ("Maintaining an existing barrier that prevents or impedes access to habitat may cause take of

25
26

[9] NFMS is responsible for ESA regulations addressing Chinook and steelhead protections and the U.S. Fish and Wildlife Service is responsible for bull trout. *See* 64 Fed. Reg. 60,727 (Nov 8, 1999) (clarifying the consistency between the two agency's rules).

listed species, if adequate comparable habitat is not otherwise available to the listed populations.").

2. <u>Impact of Rock Dam/Spillway on Threatened Species</u>

The rock dam/spillway was envisioned as temporary shoring to the headworks area for the 2020–2021 winter. (*See* Dkt. No. 48 at 715–733.) It consisted of 6,000 cubic yards of rock boulders and a steel sheet on the upstream side. (*See* Dkt. Nos. 48 at 743, 758; 49 at 108.) It was designed to stop river flow—not provide fish passage.[10] Initially, it worked as designed. It was high enough, relative to the remaining wood spillway and fish ladder, to direct flow to those structures. (*See* Dkt. No. 53-9 at 2.) But a river is hard to control, particularly with makeshift structures. Over time, deposition abutting the remaining spillway effectively raised its level, shifting flow to and over the rock dam/spillway—so much so that Defendants added a rounded cap to the top of the steel sheet embedded within the rock dam/spillway to protect migrating fish when traveling over it (whether they be fry headed downstream or adults headed upstream). (*See, e.g.*, Dkt. Nos. 49 at 110, 129–30; 54-6 at 2.)

In the instant motion, the Tribe focuses on its contention that the rock dam/spillway, at least in its current form, harms and harasses upstream migrating fish, and therefore represents an unpermitted take. (*See* Dkt. No. 47 at 27.) It does so by creating "attraction flows," *i.e.*, accelerated water which attracts upstream migrating fish <u>to</u> the structure and <u>away</u> from the purpose-built fish ladder. (*Id.* at 27–30.) Many of those fish are then blocked by the structure. (*Id.*) And if they do find a way through (depending on river conditions), they interact with components not designed for fish passage. (*Id.*) Finally, for those who survive the ordeal, the process unnecessarily tires them in reaching upstream spawning habitat, thereby reducing their ability to successfully reproduce. (*Id.*) This remains true even if they eventually find their way to

---

[10] This was not the only possible shoring approach considered during the 2020 effort, but Defendants pushed for it rather than shoreline armoring, even though the latter would not have impacted fish passage like the rock dam/spillway does. (*Id.*)

1    and up the fish ladder. (*Id.*)

2          These are not recent concerns. When Defendants originally proposed the temporary

3    structure, Eric Marks, a Puyallup Tribe biologist, opined that it would generate "false attraction

4    flows." (*See* Dkt. No. 49 at 22–26.) He was prescient. Within a few months, NMFS concluded

5    the structure represented a "devastating and unacceptable impact to threatened salmon and

6    steelhead" by establishing "significant impediments to upstream passage" including "attraction

7    flows that would direct migrating fish away from the ladder to an impassable section of the

8    dam." (*See* Dkt. No. 48 at 776.) As a result, it suggested Defendants "[o]pen[] the main river

9    channel" to "reduce the false attraction flows." (*Id.* at 773.)

10         Defendants counter later improvements ameliorated these harms. (*See* Dkt. No. 52 at 12.)

11   But they present no evidence suggesting anything but a transitory benefit. (*See generally* Dkt.

12   No. 52.) Indeed, their expert fish biologist, Dr. Jaffrey Barrett, admits the modifications were

13   rendered "unsuccessful" by subsequent changes to the riverbed. (Dkt. No. 48 at 829.) Based on

14   observations as recent as September 2023, Russ Ladley, the Tribes' Director of Fisheries and

15   Fisheries Habitat, opines that, since then, the rock dam/spillway "is a significant hazard for []

16   upstream migrants." (Dkt. No. 50 at 7) (emphasis added). His opinion is not unique. According

17   to Gabel Mabel, a Washington Department of Fish and Wildlife Fisheries Biologist, the "current

18   fish passage conditions have certainly continued to deteriorate along the rock dam and sheet pile

19   that was installed." (Dkt. No. 48 at 835.) She concludes that "this isn't surprising and is exactly

20   what most of us were concerned about." (*Id.*)

21         Defendants next counter that attraction flow hazard is an "interesting theory," but absent

22   physical evidence, *e.g.*, visible dead fish, it is nothing more than that. (Dkt. No. 52 at 11.) It is

23   inadequate to support summary judgment. (*Id.*) But the Tribe points to a litany of authority on

24   the topic. (*See* Dkt. No. 49 at 70–73). Even Defendants' engineering expert admits the fish "go

25   where the flow is." (Dkt. No. 48 at 883.) And Mr. Marks provides the Court with an unrebutted

26   explanation of why carcasses would not be evident proximate to the structure. (*See* Dkt. No. 49

at 6–7.)[11] In response, Defendants point to no countervailing evidence. (*See generally* Dkt. No. 52.) This is particularly problematic in light of Dr. Barrett's concession that "it is more challenging now" for fish to find the ladder and that "could have an effect on the number of steelhead." (Dkt. No. 48 at 831.) Fundamentally, while Defendants' *argument* conflicts with the Tribe's, their *evidence* does not; in fact, all are easily harmonized, without the use of impermissible inferences. *See Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1133 (9th Cir. 2003); *T.W. Elec. Serv., Inc. v. P. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Accordingly, the Court FINDS that Defendants fail to establish a genuine issue of material dispute regarding the rock dam/spillway's role in harming and harassing Chinook salmon, steelhead trout, and bull trout. By impeding safe passage, the structure "'disrupts their normal behavior patterns.'" *Swinomish Indian Tribal Community v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262, 1270 (W.D. Wash. 2008) (quoting *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir.2000)). As a matter of law, the structure is taking threatened species. And because Defendants' lack an incidental take permit to do so, the take is unlawful.

**C.     Remedy**

For an ESA case, all that a plaintiff must show is irreparable injury.[12] *Natl. Wildlife Fedn.*

---

[11] According to Mr. Marks, a dead fish "can travel substantial distances downstream from the point of harm; they can be eaten by predatory fish; they may be moved within or removed from the river entirely by terrestrial and avian predators and scavengers." (*Id.* at 6). In addition, a fish carcass "is slightly negatively buoyant and will therefore generally sink toward the bottom of the river, making it often difficult or impossible to detect until decomposition *may* make the carcass buoyant (approximately 7–10 days)." (*Id.*) (emphasis in original). He further notes that, "in a river system such as the Puyallup, carcasses of fish that sink to the bottom are often buried by the fluvial movements of substrate materials or by fine sediments during glacial flows that occur from late spring-through-early fall." (*Id.* at 6–7.)

[12] Traditionally, a plaintiff seeking a permanent injunction must show: (1) irreparable injury, (2) inadequate remedies, (3) a balance of hardships, and (4) public interest. *Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). But ESA cases are different—it removes the latter three factors. *Id.* at 1090. This is because Courts presume that

1    *v. Natl. Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018). And here, this has been

2    proven to the threatened fish (as discussed above) and the Puyallup Tribe, (*see* Dkt. No. 51 at 2–

3    4) (Chairman's declaration describing treaty fishing rights, the value of those rights, and the

4    precipitous decline in available fish—including Chinook salmon). *See Natl. Wildlife Fedn. v*, 886

5    F.3d at 818–19 (species level extinction is not required to show the requisite injury).

6           This leaves the Court with the task of narrowly tailoring a remedy. *Id.* at 823. It must

7    target the source of the injury, and no more. *See Nat. Resources Def. Council, Inc. v. Winter*, 508

8    F.3d 885, 886 (9th Cir. 2007) ("Injunctive relief must be tailored to remedy the specific harm

9    alleged, and an overbroad preliminary injunction is an abuse of discretion."). The Puyallup Tribe

10   asks the Court to order Defendants to (a) seek the requisite permits within 10 days and (b)

11   remove the rock dam/spillway during the upcoming July 15–September 15 work window. (*See*

12   Dkt. No. 47-1.) The Court invited supplemental briefing on alternatives. (*See* Dkt. No. 66.)

13          Defendants suggest the best approach is no action. (*See generally* Dkt. No. 67.) They

14   contend that, given myriad state, local, and federal permitting for in-water work, the most

15   expedient course is to wait for them to permit a permanent replacement, *i.e.*, the originally

16   envisioned inflatable bladder spillway. (*Id.* at 10–14.) But they provide no assurance when this

17   may occur. (*See generally id.*) And in light of the onerous state, local, and federal permitting

18   requirements for the installation of the bladder spillway, particularly in light of the 2020 turf

19   incident, this appears years away. (*Id.*) In the meantime, unpermitted take continues. Neither a

20   financial bond, nor the current Clean Water Act consent decree, which Defendants suggest to be

21   adequate remedies, (*see id.* at 7–8), are individually or collectively sufficient to ameliorate this

22

23

24   remedies at law are inadequate, that the balance of interests weighs in favor of protecting
     endangered species, and that the public interest would not be disserved by an injunction. *Id.*
25   "Congress has spoken in the plainest of words, making it abundantly clear that the balance has
     been struck in favor of affording endangered species the highest of priorities." *TVA v. Hill*, 437
26   U.S. 153, 194 (1978).

1   harm.

2           In the alternative, Defendants propose (1) constructing another temporary structure

3   upstream of the current rock dam/spillway or (2) again attempting to remove rock and gravel

4   deposition behind the wooden spillway. (Dkt. No. 67 at 8–10.) The Tribe contends, if either were

5   effective, it would be highly transient. (Dkt. No. 71 at 13–15.) Subsequent flows would quickly

6   render them useless. Moreover, as to the first alternative, the authorities' willingness to permit

7   yet another temporary structure, given the inadequacy of Defendants' prior attempts, is low. (*Id.*

8   at 13–14.) Defendants present no evidence to suggest otherwise. (*See generally* Dkt. No. 74.)

9   And as the Tribe points out, because fish passage has been impacted for years and final

10  permitting remains years away, the situation is urgent. (*Id.* at 13–15.) Absent the imposition of a

11  lasting remedy, take will reoccur. (*Id.*)

12          Nevertheless, in response to Defendants' concerns regarding safeguarding the current

13  headworks components, the Tribe suggests fish passage could be assured if only the center

14  portion of the structure is removed. (*See id.* at 8–10) (citing Dkt. No. 73 at 3–5). This would

15  protect the vulnerable aspect of the headworks. (*Id.*) And perhaps of equal importance, this

16  removal work (including necessary permitting) could be accomplished within the upcoming in-

17  water work season. (*Id.*)

18          The Court has carefully considered all proposals and supporting materials. (*Compare*

19  Dkt. No. 73, *with* Dkt. Nos. 75, 76.) It finds[13] the Tribe's alternative center removal proposal to

20  be well researched, objective, and—on balance—the most persuasive submission. Removing this

21  portion of the rock dam/spillway will ensure safe passage for upstream and downstream

22  migrating fish but is as narrow in scope as is possible. Therefore, it will adequately remedy the

23  ongoing take. As such, the Court finds it to be the most appropriate remedy presented for the

24

25          [13] While the February 15 site visit provided helpful context, the Court's observations

26  were consistent with the evidence the parties cited in their respective submissions. (*See generally*
    Dkt. Nos. 47, 52, 58, 63, 67, 71, 74.) The Court's finding is not based on those observations.

1    Court's consideration.

2    **III.      CONCLUSION**

3          For the foregoing reasons, the Puyallup Tribe's motion for partial summary judgment

4    (Dkt. No. 47) is GRANTED, in part, and DENIED, in part. Defendants are ORDERED to

5    comply with the Puyallup Tribe's alternative removal plan, *i.e.*, center-portion removal, (*see* Dkt.

6    No. 73 at 3–5), or a comparable analogue.[14] Defendants shall (1) apply for the necessary permits

7    necessary within 10 days of this order; and (2) remove a sufficient portion of the rock

8    dam/spillway during the summer 2024 in-water work season to allow for volitional upstream fish

9    passage, with a completion date not to extend beyond September 15, 2024.

10

11         DATED this 16th day of February 2024.

12

13

14

15         John C. Coughenour
           UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25         [14] Defendants may deviate from the Tribe's proposal without leave of the Court, so long
26    as those changes are endorsed by the permitting authorities and the Tribe opines that it will
      assure adequate fish passage.

ORDER
C20-1864-JCC
PAGE - 11